(Hamilton Co., Court of Common Pleas.)

GEORGE GUCKENBERGER, a taxpayer, etc., on behalf of said corporation and all other taxpayers., v. JULIUS DEXTER et al., board of trustees of the Sinking Fund of Cincinnati.

---

The contract set forth in the decision between the Board of Sinking Fund Com-

[COPYRIGHT, 1898, BY CARL G. JAHN.]

missioners of Cincinnati with Roberts & Co. of New York, for refunding the Southern R. R. bonds of that city, is void.

While courts will not control the judgment or discretion of any public officer in respect to any matter submitted to him by law; yet the exercise of this discretion is still limited by legal construction to what is known as a sound and legal discretion, excluding all arbitrary capricious proceedings. And equity will always interfere to prevent municipalities or their agents from assuming powers relating to property and funds entrusted to them to be exercised in conformity with law for the benefit of the municipality or its inhabitants.

Powers conferred upon municipalities and their agents with respect to the corporate funds and corporate property are public trusts cognizable in a court of equity.

---

SPIEGEL, J.

On the 15th day of June, 1898, the board of trustees of the sinking fund of Cincinnati, acting on behalf of the city of Cincinnati, entered into a contract with Roberts & Co., of New York, which reads as follows:

"Agreement made this 15th day of June, 1898, between Roberts & Co., a corporation organized under the laws of the state of New York, and doing business in the city of New York, in the said state (hereinafter called the 'bankers'), parties of the first part, and the trustees of the sinking fund of the city of Cincinnati, in the state of Ohio (hereinafter called the 'trustees'), parties of the second part:

"Whereas, There are now outstanding approximately the following amounts of the following issues of bonds of the city of Cincinnati (hereinafter called the outstanding bonds), that is to say: Cincinnati Southern R. R. 7 per cent. bonds, maturing in 1902, say $494, 000; Cincinnati Southern R. R. 7 3-10 per cent. bonds, maturing in 1906, say $7,644,000; Cincinnati Southern R. R. 6 per cent. bonds, maturing in 1906, say $2,890.000 Cincinnati Southern 7 3-10 per cent. bonds, maturing in 1906, say $1,860,000; Cincinnati Southern 6 per cent. bonds, maturing in 1909, say $895,000; funding floating debt 7 per cent. bonds, maturing in 1904, say $996,000; total amount outstanding estimated at $15,610,000 and,

"Whereas, The trustees, by virtue of the powers now vested in them, and legislation hereafter to be had amending or supplementing the same, propose to refund the outstanding balances of the issues aforesaid, whatever the same may be in Cincinnati consolidated sinking fund bonds (hereinafter called 'refunding bonds') of the character described in sections 2729a and 2729b of the Revised Statutes of Ohio, or authorized by subsequent legislation; and,

"Whereas, The bankers have proposed to purchase a sufficient number of said refunding bonds to refund said outstanding bonds upon the terms hereinafter stated:

"Now, therefore, this agreement witnesseth, that the trustees agree to sell and deliver to the bankers, and the bankers agree to buy and accept from the trustees, so many of the refunding bonds hereinafter described as can be lawfully issued and shall be necessary to be sold to provide for the refunding of the several issues of bonds above described, subjected to the following reservations and conditions:

"1. All the refunding bonds to be tendered to and purchased by the bankers under this agreement shall be regularly and legally issued; shall bear date of the first day of January or July of the year in which they are so purchased by the bankers; shall be payable in the city and state of New York; shall bear interest at the rate of three and one-half ($3\frac{1}{2}$) per centum per annum, payable semi-annually; and shall become due fifty (50) years and be redeemable thirty (30) years from date. If coupon bonds, they shall be of the denominations of one hundred dollars, five hundred dollars, and one thousand dollars ($100. $500 and $1,000), in such lots or portions as the bankers may designate. The bankers may require that each delivery be made in coupon bonds or in registered bonds, or partly in coupon bonds or partly in registered bonds in such proportions as they may designate; and all such coupon bonds shall be exchangeable for registered bonds, at the demand of the holder thereof, if tendered in sums of one thousand dollars ($1,000) or multiple thereof.

"2. For the refunding bonds thus to be purchased by the bankers, they shall make payment at the time of delivery in the manner hereinafter provided, either in cash, or in outstanding bonds of the issues to be refunded. If such payment be made in cash, it shall be the par value of the bonds thus paid for, with approved interest until the time of such payment. If such payment be in outstanding bonds, the same shall be accepted by the trustees at prices which will yield or represent to the city of Cincinnati an annual return of three and one-half ($3\frac{1}{2}$) per centum per annum upon the costs of said bonds to said city, said prices and said annual return to be figured in accordance with 'Price's Stock Value,' the number of days, months and years in such computation to be the unexpired term between the date of the delivery of said outstanding bonds by the bankers to the trustees and the date of the maturity thereof. And it is probable that the larger part of the outstanding bonds delivered by the bankers to the trustees will be delivered by them before maturity, and, therefore at a premium over and above the par value of said bonds, such premium may, at the option of the trustees, be paid in cash, or in refunding bonds, or partly in cash.

"3. The bankers may only purchase refunding bonds for cash within ninety (90) days next before the maturity of each of the issues above mentioned, and then only to the amount of outstanding bonds maturing within said ninety (90) days. Unless enough bonds of any issue to be refunded have been delivered to the trustees prior to ninety (90) days before the maturity of such issue to satisfy the trustees that means of payment of the outstanding bonds of such issue will be provided by the bankers in cash on or before maturity, the trustees shall be at liberty to take such proceeding to provide the required money as to them may seem necessary.

"All outstanding bonds above described as and when acquired by the bankers shall be by them promptly tendered to the trustees. Upon such tender by the bankers to the trustees for any of the outstanding bonds, more than ninety (90) days before the maturity of the bonds so tendered, the trustees shall accept the bonds so tendered, and pay the par value thereof, and the premium, if any thereon, with refunding bonds and cash as above provided.

"If the bankers shall fail to deliver said outstanding bonds under this contract to the trustees in amounts and at times as follows, viz.: Not less than five hundred thousand dollars ($500,000) on or before the first day of January, 1899; not less than one million dollars ($1,000,000) on or before the first day of July, 1899; not less than one million five hundred thousand dollars ($1,500,000) on or before the first day of January, 1900; not less than two million dollars ($2,000,000) on or before the first day of July, 1900; not less than two million five hundred thousand dollars ($2,500,000) on or before the first day of January, 1901; not less than three million dollars ($3,000,000) on or before the first day of July, 1901; not less than three million five hundred thousand dollars ($3,500,000) on or before the first day of January, 1902; then, and upon any such failure, and at any time while the same continued, and notwithstanding a prior failure of a similar nature may have been waived, the trustees may, at their option, terminate this contract by giving thirty (30) days' written notice to the bankers of their election so to do; and such termination shall absolutely discharge and put an end to this agreement and the rights and liabilities of all parties and their assigns thereunder, and shall release the bankers and their assigns from all damages and claims for damages whatsoever upon or arising out of this contract, or any part thereof.

"4. In case the state of Ohio shall, on or before the first day of July, 1900, enact a legislation authorizing the trustees to issue refunding bonds of said city of Cincinnati, maturing fifty (50) years after date without privilege of redemption at an earlier period, and payable both as to principal and interest in such kind of lawful money

as the trustees may determine, for the purposes specified in section 2729a of the Revised Statutes of Ohio, as the same law now provides or may hereafter be amended, the trustees shall issue and deliver and the bankers shall purchase and receive, refunding bonds maturing fifty (50) years after date as aforesaid, and payable both as to principal and interest in gold coin of the United States, of or equal to the present standard of weight and fineness; and in other respects of the same character as the bonds described in article 1, upon payment therefor in outstanding bonds or cash, of a premium of 1 per centum of the par value thereof, in addition to the par value and accrued interest from the date of the bonds until the time of such payment.

"5. All bonds delivered by or to the trustees under this contract shall be received and paid for in either the city of Cincinnati or the city of New York, as may be elected by the bankers with reference to each delivery.

"6. On or before the first day of January, 1899, the bankers shall present to the trustees evidence satisfactory to the trustees that a sufficient proportion of this contract has been executed by the bankers or their assigns and approved by the trustees, or has been assigned to and assumed by assignees similarly approved, whose responsibility is satisfactory to said trustees to assure the provision for that portion of the debt described herein, which matured in the year 1902.

"On or before the first day of January, 1904, the bankers shall present to the trustees evidence satisfactory to the trustees that the remaining part of this contract has been sufficiently executed by the bankers or their assigns, approved by the trustees, cr. has been assigned to and assumed by assigneees similarly approved, whose responsibility to the trustee to assume the provision for that portion of the debt described herein, which matures after January 1, 1904.

"If the bankers fall to present evidence satisfactory to the trustees in accordance with either of the two paragraphs hereof next preceding, then, in either of such events, and at any time thereafter and before such satisfactory evidence shall have been presented, the trustees may, at their option, terminate this contract by giving thirty (30) days' written notice of their election so to do to the bankers; and such termination shall absolutely discharge and put an end to this agreement and the rights and liabilitis of all parties and their assigns thereunder, and shall release the bankers and their assigns from all damages and claims for damages whatsoever upon or arising out of this contract or any part thereof.

"7. The bankers may assign to responsible parties satisfactory to the trustees this contract as to all of said bonds or any part of parts thereof, such assignees assuming and agreeing to perform all the stipulations of the bankers herein to the extent of the interest assigned to them respectively. Copies of every such proposed assignment shall be forthwith filed with the president of the trustees, and no such assignment shall take effect until the same shall have been approved by the trustees.

"8. The trustees contract only in their official capacity, and in no event are they or any of them to be individually liable because hereof; and the bankers bind themselves, their successors and assigns.

"I witness whereof, hereto and to a duplicate thereof the parties of the first part have caused their names to be signed by William Edward Coffin, their general manager, thereunto duly authorized, and the parties of the second part have caused the same to be signed by Julius Dexter, their president, the day and year first above written.          ROBERTS & Co.,

"By W. E. Coffin, General Manager.
*"The Trustees of the Sinking Fund of the City of Cincinnati.*
"By Julius Dexter, President."

To prevent the carrying out of this contract Mr. George Guckenberger, a taxpayer of this city, filed a suit in this court alleging that this contract is in contravention of the laws governing the city of Cincinnati and the board of trustees of the sinking fund thereunder, "for that the same was made and entered into without the publication of any notice of the intention to do so by the said board of trustees of the sinking fund, and without the inviting or receiving of any proposals from any person other than the said Roberts & Co. for the bonds proposed to be issued thereunder; and for that it is proposed to increase the bonded indebtedness of the city of Cincinnati in the sum of more than $3,000,000, a result which will ensue if said contract is permitted to be performed; and for that by the terms of said contract the said trustees of the sinking fund delegate their powers and duties with regard to the redemption of the indebtedness of the city of Cincinnati to the said corporation called Roberts.; and for that the execution of any such contract is in excess of the powers of the board of trustees of the sinking fund of the city of Cincinnati; and for other reasons apparent upon the face of said contract."

Plaintiff further says that "on the 12th day of July, 1898, he, in writing, requested Ellis G. Kinkead, Esq., corporation counsel of the city of Cincinnati, to apply to a court of competent jurisdiction for an order restraining and enjoining the board of trustees of the sinking fund of the city of Cincinnati from executing or performing said contract; and that said corporation counsel failed to make such application or to take any steps to enjoin performance of said contract."

Plaintiff further says that "the performance of said contract will work great and irreparable injury to the city of Cincin-

nati and to the plaintiff and all other tax-payers of the said city."

Plaintiff finally "prays that the defendant be restrained and enjoined from executing or performing said contract or any part thereof, and that upon final hearing the said injunction be made perpetual, and said contract be declared null and void, and the said trustees directed to cancel the same, and for all other and further relief that may be just."

This cause came on for hearing before me upon the prayer for a temporary restraining order against said board of sinking fund trustees, forbidding it to carry out the provisions of the contract cited. Two questions stand out in full relief in the determination of this cause.

1. Has the board of sinking fund trustees made this contract in accordance with the laws of Ohio governing the subject of selling, exchanging or refunding the municipal indebtedness of Cincinnati?

2. Is the contract itself reviewable in a court of equity, and subject to its control?

I shall first consider the first question. The trustees, in the contract made, state that by virtue of the powers now vested in them, they propose to refund certain Cincinnati Southern Railway bonds in Cincinnati consolidated sinking fund bonds of the character denominated in sections 2729a and 2729b of our Revised Statutes. These sections provide as follows:

"Sec. 2729a. The sinking fund commissioners in cities of the first grade of the first class, for the purpose of refunding the bonded debt, exclusive of street improvement bonds of the city for which such trustees act, at a lower rate of interest, and for the purpose of buying the fee simple of real estate held by the city under perpetual leases, wherein is secured to the city the option to buy the fee simple at a fixed price, and where the money to buy can be procured at a smaller rate of interest on the price than is represented by the stipulated rents, shall have power to make and issue the bonds of such city, with coupons or registered, due fifty years and redeemable thirty years from date, bearing interest at a rate not greater than 5 per centum per annum, payable semi-annually, to an aggregate amount not exceeding twenty-six millions of dollars, to be known as the ————consolidated sinking fund bond (filling the blank with the name of the city issuing the bonds). The bonds shall be signed by the president of the trustees of the sinking fund, countersigned by the auditor of the city, and have the seal of the city issuing them affixed.

"Sec. 2729b. Such of the bonds provided for in the preceding section as may be intended and used for refunding bonded debt which is payable out of or chargeable upon a special fund or special source of revenue, or is secured in whole or in part by any pledge or lien, shall be so lettered and numbered as to show the debt to which it is applicable. The secretary of the trus-tees of the sinking fund shall keep separate accounts of the proceeds and application thereof of bonds used to refund such debts, and of the revenues and sinking fund applicable to each class of said bonds, unless and until otherwise provided by law. Purchasers of any bonds authorized by the preceding section shall not be held responsible for the application of purchase money. The property, credit and revenues of the city issuing such bonds shall stand pledged alike for all of the bonds issued, without priority of right of any part of the bonds so issued by reason of priority of the date or sale of the same, or for any other reason."

The general assembly passed these laws April 9, 1880, and the testimony introduced in the cause now pending shows that at that time the bonded debt of the city of Cincinnati was, as limited in the act, twenty-six million dollars, and the refunding of this entire debt, subject to the restriction of section 2729c, now repealed, was its object. This restriction reads as follows:

"No consolidated bonds provided for in this act shall be made unless or until the trustees of the sinking fund shall, by unanimous vote, have first made a contract with responsible parties under ample security, for refunding at least a proportionate amount of the existing debt, on terms advantageous to the city, nor shall any of them be issued for any purpose other than the purpose herein authorized"

No action to refund the entire debt was taken by the trustees under the provisions of this act. January 29, 1885, this act, including section 2729c, was re-enacted by the general assembly, but the trustees did not avail themselves of its provisions, and March 12, 1887, the general assembly passed an act authorizing, under certain conditions and safeguards, the sale of the Southern Railway, and by section 3 of said act, in order to enable the sinking fund trustees to arrange the terms of the payment of the purchase money, they were authorized to issue consolidated city sinking fund bonds to retire and refund the outstanding Southern Railroad bonds, in such manner and form as they might determine; and section 2729c of the sinking fund was repealed. The Southern road not being sold, the trustees did not refund its bonded indebtedness, nor under the other acts quoted, the entire indebtedness of the city. On March 30, 1896 the general assembly passed the laws known as sections 2729g (2) and 2729h (2) which read as follows:

"Section 2729g (2). That in any city wherein trustees of the sinking fund have been appointed under the provisions of section 2715, Revised Statutes, such trustees, in addition to their other powers, shall have the power to make and issue for the purpose hereinafter specified in section 2729h, the bonds of their city, with coupons or registered, running for such length of time, not ex-

ceeding fifty years, as the trustees may determine, and bearing interest at a rate not greater than 4 per centum per annum, payable semi-annually. Such bonds shall be known as———— consolidated sinking fund bonds (filling the blank with the name of the city issuing the bonds). The bonds shall be signed by the mayor of the city, countersigned by the auditor'or corresponding officer, and have affixed the seal of the city issuing them. The principal and interest may be made payable at such place and in such kind of lawful money as the trustees may determine. Such bonds shall be sold as provided by section 2709, Revised Statutes.

"Sec. 2729h (2). The purpose for which alone the bonds provided by section 2729g may be made, issued, and sold shall be the renewal or extension of existing bonded debt of the city which from any reason the trustees of the sinking fund of such city are unable to pay at maturity. The bonds authorized by section 2729g shall never, for any city, aggregate in outstanding amount to more than what may at any time be unpaid of the authorized debt of such city not outstanding and hereafter lawfully authorized to be issued, it being the object of section 2729 to provide only bonds for renewal or extension of legally existent bonded debt which at maturity is not paid and extinguished; and to that end the power herein and by section 2729b conferred is a continuing power, and includes renewal of bonded debt now existing, hereafter lawfully created by said cities respectively, for which the trustees of the sinking fund act, and extends to one or more renewals of any of the bonds issued hereunder; but nothing herein shall be construed to excuse said trustees from levying and applying taxes for sinking fund and the earnings from investment thereof, as now provided and required by law."

Counsel for plaintiff contends that these latter acts must necessarily be read in connection with sections 2729a, because all of them are in pari materia, and especially so, as they are the later expressions of the will of the general assembly on the subject of renewal or extension of the existing debt of the city, which the trustees of the sinking fund are unable to pay at maturity.

Counsel for defendant admits that the so-called refunding contract entered into is in reality a contract for the exchange of bonds. If so, this is then simply an extension of the indebtedness now existing, and the rule of law, laid down by the general assembly in the latter acts, must apply.

But is the contract not more? It provides that the trustees agree to sell and deliver to Roberts & Co., of New York, and the latter agree to buy and accept from the trustees as many of the refund-

ing bonds as may be lawfully issued and be necessary to be sold to provide for the refunding of the several issues of bonds described.

Counsel for defendants claim that the sale of bonds thus provided for in the contract is only a necessary and proper incident of a refunding contract, and does not have the effect of changing the contract from one of refunding or exchanging bonds to one of sale.

The rule of law for the exercise of power by public trustees is one of strict construction. They cannot exercise powers incidentally which they can not exercise directly otherwise than in compliance with the rules of law governing such exercise.

Taking the language of the contract itself to explain the transaction, the court must find that it is a bond sale.

The question then arises, is this sale governed by the general statute, to-wit, section 2709, as provided in section 2729g (2)? Section 2709 provides that no sale of bonds of a municipal corporation shall be for less than their par value, nor to any but the highest and best bidder, after thirty days' notice in at least two newspapers of general circulation in the county where such municipal corporation is situated, setting forth the nature, amount, rate of interest and length of time the bonds have to run, with time and place of sale; and further, that additional notice may be published outside of the county.

As already stated, sections 2729g(2) and 2729h (2) are in pari materia with section 2729a whenever the trustees desire to issue and sell Cincinnati consolidated refunding bonds. It is the action contemplated by the trustees, not the name by which it may be called, which governs. I have already found that the action contemplated by the trustees in the contract made with Roberts & Co. of necessity involves a sale of new refunding bonds, and such a sale whether an incident of the contract or the contract itself, is governed by the rules laid down in section 2709. It can not be eliminated, and the rest of the contract upheld, for the sale is of the essence of the contract.

My construction, that a sale of refunding bonds is thus governed by section 2709, has also been adopted by the trustees themselves, as testified by Mr. Dexter; and in finding that the contract complained of is one for the sale of refunding bonds, I am but following the language of the trustees themselves, as expressed in said contract, as well as by a fair construction of the contract itself.

2. The second question arising in this case is: Is the contract reviewable in a court of equity and subject to its control? It is a well-known rule of law that a court will not control the judgment or discretion of any public officer in respect to any matters submitted to him by law; but the exercise of this discretion is still limited by

legal construction to what is known as a sound and legal discretion, excluding all arbitrary capicious proceedings. And equity has always asserted its jurisdiction in respect of property held by municipal corporations in trust, or when clothed with public duties, to see that the trusts were performed and the public duties discharged. Equity will always interfere to prevent municipalities or their agents from assuming powers relating to property and funds entrusted to them to be exercised in conformity with law for the benefit of the municipality or its inhabitants. Powers conferred upon municipalities and their agents with respect to the corporate funds and corporate property are public trusts, cognizable in a court of equity. Section 1777 of our Revised Statutes distinctly authorizes an injunction to prevent the abuse of corporate powers, as well as the execution or performance of any contract in contravention of law.

Is the contract in the city's interest?

Is the contract entered into by the sinking fund trustees with Roberts & Co. injurious to the cestuis que trustent, the inhabitants of Cincinnati? The testimony introduced upon the trial by plaintiff was admitted by the court for the purpose only of showing whether the exercise of this power by the trustees was a sound legal exercise of the powers granted to them or not. It was testified by Mr. Kleybolte, and not contradicted by Mr. Dexter, that Cincinnati 3.65 bonds are now worth more than 8 per cent premium, and are sold at that rate in the open market. This court must also take judicial notice of the fact that on August 2, 1898, one of the municipal agencies of the city, the Cincinnati water works commission, sold $500,000 3½ 20-40 bonds of its issue at a premium of $18,500, eight bids for this issue by bankers from different cities, ranging from $16,000 to the premium named, having been received, with lower bids from different bankers. The testimony submitted in the cause shows that the credit of Cincinnati is not decreasing; that 'the interest rate is becoming lower, and that our bonds are selling at a high rate of premium. Taking the rate of premium paid for $500,000 of 20-40 bonds, the testimony introduced shows that upon the issue of the consolidated sinking fund bonds as proposed by the trustees a loss of $555,000 has accrued to the city by reason of the sale of the consolidated sinking fund bonds to Roberts & Co. without any premium; a loss still larger if the rate at which a similar issue of bonds is now selling in open market, as testified by Mr. Kleybolte, to-wit: 8 per cent. premium, is taken into consideration, increasing this loss to almost $900,000.

Mr. Dexter, in his testimony, admits the loss of the premium, but justifies it by the refunding of this large indebtedness at a very low rate of interest at the present time. I can not say that this distinction justifies the loss of this large premium to the municipality. The Southern Railroad bonds to be refunded will continue to draw their present high rate of interest until they mature, and the fact that they will then be paid by the issue of a low interest bond to Roberts & Co. certainly does not justify the loss of the premium which a sale of these bonds by competition would realize—a sale which would not retard the refunding of the bonds in any manner. The exercise of power therefore, by the trustees, even if within their discretion, was not the exercise of a sound discretion within the purview of the law, but—with the best intentions and good faith on the part of the trustees, which everybody concedes—will entail a loss of such large proportions to the cestui que trust, the municipality, that a court of equity is compelled to declare the contract void under the rules cited by the court. The loss of premium is admitted by Mr. Dexter, on behalf of the trustees, but he denies the further loss of interest to the city, ranging from $2,000,000 to $3,000,000, as asserted by Mr. Guckenberger and Mr. Wright. I have not passed upon this phase of the case, not deeming it necessary to its adjudication; nor upon the question whether this issue of the consolidated sinking fund bonds falls within the litimation of $26 000,000, or whether it exceeds the aggregate indebtedness sought to be refunded, as claimed by plaintiff; nor, if the latter, whether the interest to be paid till maturity becomes part of the aggregate indebtedness or not; nor whether the act of April 26,1898, giving the Southern Railroad trustees power to extend the same series of bonds, deprives the sinking fund trustees of their power; nor, finally, upon the question which presents itself to my mind, whether the sections under which the trustees claim this special grant of power, are not themselves unconstitutional. Those questions I have not considered necessary for a determination of this cause. If they should become so hereafter, a reviewing court will undoubtedly pass upon them.

Counsel for defendant urges upon the court the fact that over two million dollars of refunding bonds heretofore issued by the trustees and now outstanding are illegal if the present contract should be declared to be so; and he hopes that it may not be found necessary to render a decision involving such a blow to the credit of the city. I am frank to say that I do not appreciate the reasoning of the distinguished counsel. Our federal supreme court has determined over and over again that, provided the body issuing bonds had the power to do so, said bonds are valid in the hands of innocent purchasers, even if said power was not exercised in the manner prescribed by law. These bonds, therefore, though

their issue might have been enjoined, if issued in the manner of the present issue of bonds, are valid, because the trustees had the power to issue them under section 2729h(2). And even if they had not the power to issue them, still the bondholders are safe, in accordance with the decision of Judge Dundy, of the eighth federal circuit court (37 Fed. Rep., p. 246), wherein he holds that the holders of valid municipal bonds who surrender them to the municipality for other bonds, which it had not the lawful right to issue, does not alienate the title to the original bonds so surrendered. The credit of the city is, therefore, safe, and will, perhaps, become safer by reason of the fact that its bond issues, no matter by whom issued, when sold, can only be sold in the open market to the highest and best bidder.

In accordance with the views herein expressed, the prayer of the plaintiff for a temporary restraining order, enjoining the defendants from executing or performing said contract, or any part thereof, must be granted, and said temporary restraining order will accordingly issue.

For the plaintiffs:   Peck & Shaffer. and Fred. Hertenstein.

For the trustees: Corporation Counsel, and Lawrence Maxwell.

For Roberts & Co.:  Foraker, Outcalt, Granger & Prior.